The Fourth District Appellate Court of the State of Illinois has now convened. The Honorable James A. Kinect presiding. Good morning. This is our first case 421-0492, People of the State of Illinois v. Jessica Logan. Would you introduce yourself, Mr. Lenz? Yes, Gilbert Lenz from the Office of the State Appellate Defender for Jessica Logan. Thank you, sir. And Mr. Londrigan? Yes, Timothy Londrigan for the State with the Office of the State Attorney's Appellate Prosecutor. Very good. You may proceed, Mr. Lenz. Thank you, Your Honor. Good afternoon to the Court and the Council. Again, Gilbert Lenz from the State Appellate Defender on behalf of Jessica Logan. Your Honor, this Court should remand for a new trial due to the combined effect of the numerous errors in this case, from the Court's erroneous decision not to suppress the reenactment video, to Council's failure to try to suppress Dr. Denton's opinion testimony that was based solely on that video, combined with the several errors raised in Argument 3 from Officer Sawyer's improper opinion testimony about Jessica's credibility, to Council's own elicitation of evidence that was harmful to the defense, and to the improper testimony about prior DCFS contacts, among other errors. If this Court agrees that some or all of these errors occurred, the trial would have looked much different without that evidence. A fair trial in this case would have consisted of the State's circumstantial evidence of guilt. There was no physical evidence or confession, combined with Dr. Denton's not unequivocal conclusions about the cause of death. And at a fair trial, in light of that State's evidence, Jessica would have been making a decision whether to put her own credibility in front of the jury, and if she did, the jury's credibility determination would have been key, as it was at this trial. And for those reasons, the State's evidence was not overwhelming, such that the errors that occurred here require a new trial. Turning to Argument 1 regarding the Miranda violation, this Court's Miranda custody analysis should really start about two weeks prior to the actual reenactment. And that's because, in this case, unlike the typical Miranda case, an agent of the State, a DCFS agent, someone with the authority to take Jessica's son from her home, someone with the authority to refer her to the prosecutor, told Jessica she was required to participate in a video-recorded reenactment done by the police. That's in dispute, isn't it? That's not in dispute. What about the required part? The DCFS agent told Jessica, it's undisputed that the DCFS agent told Jessica she, quote, had to do the reenactment. Well, that's not required. You use different language. That's what I'm referring to. Right. She was not able to recall her exact words to Jessica, but she testified that Jessica had to do the reenactment. Ms. Taylor testified that Tate told Jessica she had to do the reenactment. I believe Tate used the word need to do the reenactment, whereas Ms. Taylor used the word had. But in any event, Ms. Tate testified that she believed Jessica had no choice but to participate in the reenactment, and that was clearly conveyed in her words to Jessica. And Jessica herself testified that she felt she had no choice but to participate in this. And that fact... Can I ask you, counsel, what is it that she said that leads you to believe that the DCFS worker thought that the defendant had no choice? Ms. Tate from DCFS testified at the suppression hearing that, quote, there was no saying no. Now, it's unclear... That's what I'm getting at. I read it the way I think you are reading it the first time I saw it. But she said there was no saying no. She didn't... And then it goes on to say something to the effect of she didn't say she didn't want to do it or something to that effect. Wasn't she saying that the defendant didn't say no? No, I don't believe that's a reasonable reading of the record, Your Honor. First, Leandra Tate testified that Jessica's reaction was that she did not want to do the reenactment. And the rest of that testimony was, quote, but there was no saying no. That, I believe... I believe that line of testimony... I'm not quoting it verbatim, but Jessica said she did not want to do the reenactment, but there was no saying no. She didn't really want to do it, but there was no saying no. She didn't refuse to do it, if that's what you're asking. Right. And if you read that whole quote together, it sounds like she's talking about... Jessica never said no. Jessica clearly conveyed that she did not want to do it, and Tate clearly conveyed to Jessica that there was no saying no. I believe that's the most reasonable inference from that testimony. And in Tate's earlier testimony, she said that she told Jessica she needs to do the reenactment as part of a criminal investigation. And Hope Taylor also testified at that hearing and corroborated that Tate told Jessica she, quote, had to do the reenactment. Jessica testified that she felt she had no choice but to do the reenactment. The question of whether she refused to do the reenactment is a separate one, but there's no burden on a defendant who reasonably feels they're required to perform or to answer questions. No case puts a burden on the defendant to object or to refuse, and that's seen in all the cases cited by either party here. So this key fact from about two weeks before the reenactment colors the entire analysis of the case, and that's what the trial court failed to include in its calculation here. Jessica came away from her meeting with Tate feeling like she had no choice but to participate in the reenactment. She had two encounters with Detective Matthews before the reenactment. Once on the phone, when he called her to set up the reenactment, he never told her she was not required to participate. He never Mirandized her. Then on the day of the reenactment, which was at the venue of his choosing, not hers, he also never Mirandized her, never told her she was free to decline to participate. Instead, he had Jessica enter the apartment alone with five agents of the state and actually affirmatively kept Hope Taylor out of the apartment. And the judge made a factual finding as to that, the officer kept Taylor out of the apartment. This combination of facts indicates that a reasonable person would not have felt free to decline to participate. And at some point, as the trial court found, someone should have Mirandized Jessica. And I think the only reason the trial court clearly had problems with what happened here, and I think the only reason the trial court didn't grant the motion to suppress is because the court itself was under a mistaken impression as to the legal burden that Jessica had to meet or that the state had to meet. The court was simply wrong that the strong arm tactics seen in some of the cases are required in order to make a finding of Miranda custody. Strong arm tactics aren't necessary where something like what happens here happens, which is an agent of the state tells the defendant that she's required to answer questions. Is there any significance to the fact, Mr. Lenz, that the agent that was telling Jessica that she had to cooperate, or at least conveying to her that there was this need to do this in order to further the investigation, was also someone working for an agency that had the authority to remove her other child? That's absolutely relevant, Your Honor, and there aren't many cases with even a few of the similar facts we have here. But I would point the court to the Fred case where a social services agent told the defendant he had to go to FBI headquarters to answer their questions about a possible allegation, again, about something he did to his daughter. And that social services agent, it's not as clear as it is in this case that it was a DCFS type of agent, but it was someone who was involved with the child welfare agency. And that played a large role in that court's decision to find Miranda custody, even though that defendant, like Jessica, drove himself to the venue for the interrogation. So yes, the short answer to your question, Your Honor, is it absolutely significant that the DCFS agent is an agent of the state who had significant power over Jessica and her son? Finally, Your Honors, if this court agrees that there was a Miranda violation here, then this court should remand for a new trial on that alone under either ineffective assistance for failure to preserve the issue or plain error, as this court recently did in Cato. And that's because this video was crucial to the state's case by the state's own words at trial. It played the entire video for the jury. It pointed the jury to the video and closing arguments as corroborating Dr. Denton's testimony, which in turn was based solely on the video and, as the prosecutor argued, was the most important evidence of Jessica's guilt in the prosecutor's mind. So, if this court agrees, the video... Now, you've said that twice, Mr. Lentz, that the doctor's opinion was based solely on the video. It would appear that when you read the transcript, the doctor had actually formed his opinion as to what the cause of death was. He made it very clear that the child had died by some form of asphyxia. It was an asphyxial death, possible suffocation, smothering, or strangulation. But in cross-examination, he acknowledged that he'd already ruled out strangulation. He already had determined, basically, the cause of death was an asphyxial cause of death. And when questioned on cross-examination, he admitted that he didn't have to determine the manner of death. That had nothing to do with him. That's the coroner's job. So hadn't he, in fact, actually concluded what the cause of death was before the reenactment? He made two... I believe the record indicates he made two conclusions. One, after the autopsy was more provisional, where he concluded that the cause of death was some form of asphyxiation, unconnected to a specific act. Then, at trial, he testified that he needed further investigation. His further investigation consisted solely of watching the reenactment video. I thought his further investigation was the toxicology tests, the other laboratory examinations that were done to determine whether there was any evidence of infection, some sort of allergic reaction. It was more chemical testing, wasn't it, than observation? Well, I'm sorry, Your Honor. Yes, there certainly was toxicology testing involved, but at the trial, defense counsel asked him if his further investigation that he required after his initial conclusion consisted of just watching the video. He agreed with that. And the important point here, Your Honor, is that he offered a different conclusion only after watching the video. So before the video, it was some form of asphyxiation, unspecified. After watching the video, he added the words, smothering due to compression. Let me ask you a question. For purposes of a medical examiner's purview, what's his obligation beyond simply determining cause of death as opposed to manner of death? He's under no obligation to tell the jury what the manner of death was. His job was to determine that it was an asphyxial death, right? Yes, although… He opines later, based on the video, that, well, I can now tell you what the manner of death is. Or at least I can exclude some other things that were not the possible manner of death. But was that really part of his purview? Well, he specifically declined to offer testimony about the manner of death. He offered more refined testimony about the cause of death only after watching the video. And that's the point here. I understand he said when asked flat out on cross that, well, he doesn't determine manner of death, but isn't that in fact what he did after looking at the video? Well, that's certainly our argument, Your Honor, that what he did, his testimony, his conclusion, only after watching the video, was more inculpatory, more indicative of a homicide, far more indicative than what he said initially after the autopsy, which was that the child died by, quote, some form of asphyxiation. So that gets me to my point. We started this whole discussion with the need of a reenactment. What was the need for a reenactment? It was, according to the record, it came from Dr. Denton. Dr. Denton asked Detective Matthews for a reenactment. We don't know exactly what happened next, but we do know the next thing that happened is the DCFS agent told Jessica we need to do the reenactment. And then when Detective Matthews called Jessica about a week later to set up the reenactment, he told her that it was for Dr. Denton's investigation, not for his own, not based on his own suspicions. Tate also said that there was a need for the reenactment for the DCFS investigation to go further, correct? Yes. She told Jessica there were two investigations going on, DCFS and criminal, and that the reenactment was necessary to both. But that would be done in the presence of detectives and it would be video recorded. And as Tate herself testified, she believed there was no saying no, and she conveyed that message to Jessica. I think that's the most reasonable inference from all of that testimony, that Jessica was told she was required to do it. And no one ever corrected that impression. And those are all crucial facts in this case, leading up to all the relevant facts that occurred on the day of the reenactment. She was alone in the room. Taylor was barred from the apartment. There were five agents of the state with her. So this is not a typical case, but this is a case where I think the only reasonable conclusion is that a reasonable person would not have felt free to decline to answer Detective Matthews' questions. Mr. Lenz, before we leave this topic, I'm going to ask you something about, well, I don't know your experience, but I've been a judge for 47 years, trial and appellate. And I, to my memory, I've never, ever participated in a case where there was a reenactment or anybody said that it was routine or anybody said this was something we regularly do. Other than the cases you've reviewed on appeal, where there might have been some similar situations, have you come across reenactments? Well, with apologies to the state, because these cases are not in the briefs, I am familiar with two cases from the previous decade involving reenactments. One's published and one is not. The unpublished one could not be cited, of course. The published case was so factually dissimilar, it didn't make it into the briefs. But it is something that happens. I would agree, though, the point here is that Jessica was told this was standard procedure, normal procedure. Dr. Denton testified, I think, if I may say so, kind of bizarrely in saying that this happens in every case with child death. And I'm not, as you say, Justice Connect, I don't think that's accurate. So the point here is that... Dr. Lentz, Dr. Denton doesn't just work for this jurisdiction, right? He's a physician that does this type of work. And so it may be common in other jurisdictions. Certainly. And in fact, the unpublished case I referenced earlier was a Fifth District case where he was also the medical examiner that involved a reenactment. But again, not only unpublished, but also quite factually dissimilar. So for all those reasons, Your Honors, this is a case where a reasonable person would not have felt free to decline to participate in the reenactment. This is a case where the reenactment video was crucial to the state's case, and thus was prejudicial error requiring a new trial. And that's before we even get to whether this court agrees that parts of Dr. Denton's testimony that were based on the video should have been suppressed, and whether counsel was ineffective for preventing the jury from hearing the numerous examples of improper testimony, overly prejudicial argument, and then eliciting himself testimony from Detective Matthews about all the different reasons why he thought that Jessica was guilty based on his listening to the 911 call. Would that be fairly characterized, though, as a strategic decision by counsel? Not in this case, Your Honor, because the state is arguing that the strategy here was that Detective Matthews had tunnel vision. And there are many cases where the defense makes that argument, and that is a reasonable strategy. But to say, to argue that, or to try to present Detective Matthews as someone with tunnel vision is not the same as asking him a question that invites him, an open-ended question that invites him to detail for the jury all the reasons why he thought Jessica was guilty after listening to her 911 call. The state never elicited anything about the 911 call other than that it happened. So there was simply no reasonable strategy behind him asking Matthews that question and then resulting in that answer, which was, like Officer Sawyer's opinion testimony, highly prejudicial, highly improper. Well, doesn't the fact that it comes directly from defense counsels first tend to support Justice Doherty's question that doesn't that seem more a strategic decision? Your Honor, something can be strategic and still be unreasonable. It could have trial counsel, we don't know what trial counsel was thinking, he may have thought that that was his strategy. There was a grossly unreasonable strategy in this case. Well, it may not have been the best strategy, and it obviously didn't work, but that doesn't necessarily mean that it's a strategy that may not be reasonable under all the circumstances. You refer to this as a closely balanced case, I'm not sure where you get that. I apologize, I took up your time. Well, that's okay, if I may conclude. Same answer. Thank you. It's a closely balanced case. If this court agrees that some or all of the errors occurred because the trial would have looked much different, it would have been limited to a fair trial here would have been limited to state circumstantial evidence, the jury's determination of Dr. Credibility, which would have been based on his non equivocal is not unequivocal opinions, and also Jessica's credibility if she chose to testify at retrial. That's what a fair trial would have looked like here and for all those reasons this court should remain for new trial. Thank you counsel will hear from you on rebuttal. Mr. Lonergan. Thank you, Your Honor is very pleased court counsel. You can please me Mr Lonergan by answering, answering the question that I asked. I know that you're experienced. Are you familiar with reenactments. I am, I am not your honor. I've been around the block a few times too, and never come across a case where we had a reenactment haven't done a great deal of criminal trial practice. So, you know, in that realm. I would not have had the opportunity, but in knowing none of the briefs that I've done in the last 39 years have I come across someone that has suggested doing a reenactment. So, well, I would also suggest. I don't know how many counties we have now I still haven't caught up quite entirely with the redistricting, but we were 40 counties for years. Thus, you would have seen potentially seen these cases as a representative of staff staff. Well, you know, these are kind of unique, I see Dr. Denton's testimony is basically restricted to child suffocation cases. I think that's what he was saying he thought it was somewhat routine. And I think all he's trying to do there is to try to be a reasonable professional in giving an opinion, he'd like to get as many of the facts as he can prior to giving his final judgment. I think he was able to give a opinion as to cause of death prior to looking at the video, or hearing any of the testimony from defendant as to how this suffocation occurred. I think what he wanted to do is before coming to a finite conclusion is just, you know, listen to how the defendant was going to suggest this child died, so that he could either agree that it met with his previous findings or suggest that they did not. That's an elegant spin. I congratulate you on that. You may proceed with your argument. Well, I don't know about that, but, you know, basically that is our, I mean, as you pointed out, Justice neck, you know, there's an allegation by the defendant that we pretty much agree on what the facts are but but then we, you know, start off by saying I think is the defendant in his brief state, 10 times that the defendant was told that she was required to do this reenactment, and clearly she was not. I think the observations of justice story or well placed. At best, this language by DCF is DCF as agent Tate is somewhat, you know, unclear, you know, it can be interpreted in more than one way. And she does not stay in any interpretation that the defendant is required to do this. You know her statements are pretty clear. She says that they need whoever they are I suppose the state needs to have this reenactment done so that they can move forward with the investigation. Mr Landrigan is there any difference here. If that same conversation between the defendant and Tate was between the defendant and a police officer. Does it matter at all. You know judge I couldn't find any cases on point for that, you know, I was trying to find somewhere where a DCF agent was involved in whether or not you know that provided some insulation for the state and the need for a Miranda warning and I couldn't find a case that discuss that so isn't the simpler question if a police officer calls a suspect and says, We need to speak with you. I'd like to see you at the station. Is that enough to start it out custodial. No, I don't believe that it is judge. I mean I, as I stated in my brief I don't think these questions were any more than routine investigation. I mean this doesn't even come close to requiring a Miranda warning. It has nothing to do I mean these circumstances are so far removed from the circumstances that existed when Miranda was first created that I can't see the application extending to this degree. We require police officers under set of circumstances similar to these give Miranda warnings every time they ask, you know, a potential suspect anything. You know, I mean we might as well just forget about it and just give Miranda warnings every time we asked what time of day it is. Well, are we talking about a potential suspect or the only suspect me even the officer acknowledged that she was clearly the only person that they were looking at. And so, DCFS then approaches her first and says, We need to do a reenactment, we do that in all of our own child death cases, it will be a detective at least myself and her where it will be videotaped and we need to do the reenactment so we can move forward on the investigation. She said, Jessica indicated she didn't want to she didn't want to have to go back to the apartment was very emotional about it. She didn't really want to do it, but there's no saying no there was, she didn't refuse to do it. If that's what you're asking, that's what the, the DCFS investigator said but she made it clear that this was something that we need to do to further both the DCFS investigation, and the criminal investigation. I don't see a great distinction in that judge from an officer saying I'm trying to find out who murdered this individual. So where were you on the night of February 2. You know, he's obviously doing the same thing. It's just the state saying I'm trying to do my job as a police officer and find out what happened. Can you tell me what you saw. Can you tell me what you think happened as opposed to need is the difference there is that's, that's a straight up interrogation. The difference here is that this is a supposed need for this reenactment in order to complete a medical examiners evaluation which I think is pretty clear wasn't really necessary as part of a medical examiners evaluation. It's represented by the police officer to the DCFS worker as something that needed to be done. The DCFS worker who has the authority to remove this woman's other child tells her this is something that needs to be done. They then have the police officer, talk to her about. He doesn't even ask her anymore now it's just a matter of when and where are we going to do this, or what time are we going to do this we already know where we're going to do it. And then it's a matter of showing up. What if, if we concluded that this were a concerted effort by the medical examiner DCFS and the police to circumvent the need for Miranda, by setting this process up in this man. What effect would that have on the outcome. Well, I don't think it would have any effect on the outcome runner, you know, because I thought that was in fact the argument that was being made by the defendant in this appeal. So, let's assume that that is, you know, the defendants argument. And I think that that argument is not well founded I don't believe that the doctor required it. I don't think that the officer said that we needed I don't know that exactly what the testimony was with regard to the officers conversation with the DCFS agent. But I don't think that the agent. You know said anything more than we need to do this, she was trying to encourage the defendant probably to go along with it. You know, I'll grant that. But I think she said we needed to do it in order to complete the investigation. That doesn't mean the defendant needs to do it, or else some punishment will be instilled upon her. She's not being advised what her legal rights are by that DCFS agent. And so, you know, the question becomes, does she even have any hesitancy. I mean I don't believe that she does have any problem speaking to the police, her hesitancy, if any, wasn't going back to the house where the death occurred because of the So, you know, she agreed to have her home search for evidence. She agreed to have her phone search for evidence, and she agreed to this reenactment, and she gave no reason for any agent of the state to think otherwise. I mean she didn't suggest no I don't want to do this. I might incriminate myself or any words to that effect or I don't want to be of assistance. And this investigation any further, or I want a, an attorney or a counselor appointed to me. She didn't make any of those types of statements. And it's not up to the police to just assume and try to encourage her not to cooperate. I think they're fair to ask. And if she indicates a willingness to go along with it. I don't see a problem. And so, you know, this case, really when it comes down to it I think we're blowing out of proportion, the significance of this videotape anyway. This videotape reenactment does nothing that the defendant didn't do herself, and her testimony at trial. And it's nothing that she didn't do. When I think it was detector or policeman Sawyer first arrived on the scene. She suggested the, you know, events leading up to the death of her child, and none of it made any sense from the word go. I mean, she's indicating that her child had suffered with some type of upper respiratory problem. No evidence to support that the doctor who she said she went to testify, there was no such ailment. When she examined the child. A few weeks prior, she said she gave a bureau treatments, twice a night, midnight three. Excuse me, and three o'clock in the morning, set two alarms to do so and had done so for the previous several nights. Yet, she there was no bureau in a home. That evening. So why was she setting an alarm for midnight and three o'clock in the morning, if she knew she had no bureau to administer. Then she says well I called the doctor's office the previous Friday and I had her give a new prescription of the albuterol days before, when I noticed I was running low. Again, the doctor says no such call in her records. Then she's the only person the only adult in the home she has another four year old child but those are the only people in the home, and Dr. And defended argues on appeal that it wasn't clear exactly when this occurred. Well, these things are date and time stamped, so it's perfectly clear that this happened at 8am on a morning of October 6. She says to her husband I mean they argue back and forth about the financial problems are having she can't pay any of her bills she can't get a job. But they boy they agree that life insurance bill $35 is the most important bill they have not the food bill to feed their family not the heating bill the rent. It's the life insurance bill on their 19 month old son. And then the very day of his death. She makes a claim for life insurance to the agent. You know, these things, when you add them up, you know, the significance of this reenactment is just not there. She took the stand the defendant, and she gave the same testimony that's in the reenactment. If we want to speculate now as well. If that reenactment had been thrown out perhaps this would have occurred or that would occur. Well yeah the state might have changed how they presented testimony, and we would have Dr didn't perhaps testify in a different manner. But that's pure speculation. What we do know is that the evidence of this woman's guilt for this offense is simply overwhelming. And, you know, the significance of any that this reenactment play has to be considered very minor. We really didn't get into the arguments that were raised in Roman numeral to about the Fourth and Fifth Amendment. I'll just stand on my brief for those, I don't think that they were as significant either I think they pretty much hinge on the success of the reenactment video. And then we're just left with, you know, numerous other things and why did defense counsel employee the strategy that he did a trial. Why did he admit this evidence in that, you know, I've tried more cases and I care to recall, never did a single case go in the way I wanted it. Neither was there a case where I didn't feel I could have done a better job, or, or put in something in a different light or a different manner. Regardless, what I'm trying to say is this guy may have made some decisions that the rest of us would not have made, but I think he did what he thought was the best job he could under these circumstances, and he was given a pretty difficult case to try. And I think he just tried to poach poke holes where he could perhaps he overdid it here and there, but that's trial strategy. And, you know, that's what has to be allowed, you know, for effective assistance of counsel. The testimony by Sawyer commenting on what he felt the genuineness of the, what your, the defendant was expressing. There's no great support from that is there that's that's sort of basic you don't get witnesses commenting on the truthfulness of other witnesses. Well, it can be interpreted in that light judge. I won't argue that fact. But, you know, he's trying to suggest, you know, as, as best as he can recall what he saw upon arriving there the difference between the emotional outburst of the mother in law, versus that of the defendant. When he says it seemed force, in my opinion, you see people cry I didn't see that he can certainly say he didn't see tears but when he gives opinions about whether it was forced or not that does sound like him commenting on the truthfulness of her statements. Is that not improper. Well, it's objectionable. I don't know, you know, the purpose for which it's being admitted at that time if it's to give an opinion on the credibility of the defendant. It may be objectionable and excluded. If he's trying to describe the difference in how the mother in law presented versus what the defendant presented, and he's simply offering opinion like testimony, and an effort to try to appreciate how those two women presented. I think that it's appropriate. So, he was given a hard task. I mean, the officers, trying to put into words. What he saw, and it didn't seem to be authentic. Now, whether or not the use of terms like that call for an opinion, and I'll leave for this court to decide. And if there's no further questions from the panel. I see none. Thank you, Mr. Mr lands on rebuttal. Yes, thank you, Your Honor. A reasonable strategy has to be reasonable. And there's no reasonable strategy that allowed for counsel's failure to object to officer Sawyer's improper opinion testimony about Jessica's credibility, and then to affirmatively elicit similar, and even more reasonable strategy. And in addition to the the reenactment video, being a Miranda violation. If this court finds any, any of those to be an effective assistance that only adds to the reason why a new trial is required on argument one regarding the Miranda violation. The state's argument here on appeal is kind of belied by the trial prosecutors own position before the jury. Certainly the state has circumstantial evidence of guilt but when the prosecutor trial got up in front of the jury and said told them what what the most important things were in this trial. The first thing he said was Dr. Denton's opinion. And the second thing he said was the reenactment video, which, according to the prosecutor corroborated Dr. Denton's opinion. If this court finds that there was a Miranda violation that required suppression of the video, then this trial would have looked much different. It would have been missing. One of the two most important pieces of evidence that that the state itself argued a trial, and there's a reasonable probability that Dr. Denton's testimony would be more limited at retrial, particularly because he would he almost certainly would not be allowed to testify that based on his viewing of the video. He believed that it could not have happened the way it happened in the video if there's no video he's not allowed to give that opinion, which is separate from the opinion he gave about cause of death. His opinion about cause of death, also would be more limited because a reasonable judge could be more limited because a reasonable judge could bar him from testament testifying about his opinions that were based on the video. So, without the video, without Dr. Denton's more conclusive opinions, without his opinions about the video, and without all of the errors that occurred at the trial with the improper opinion testimony, the improper argumentation, the improper unequivocal opinion, much more limited opinion, and there's a reasonable probability that Jessica would not have testified or if you would have testified her credibility would have been in front of the jury again. And that makes it a not overwhelming case. And that's why I'm required to the contrary Mr lens. If we disagree with you on the Miranda issue on the issue one. These other these other issues are not a great consequence right I mean the trial would have looked very much the same. Well, without officer Sawyer, giving that opinion, and so forth. Well, I would disagree. Because of the issues raised in argument three I think, I think if this court finds that some, some of those errors in argument three were actual error, then those were sufficiently prejudicial to require a new trial regardless of the first two arguments and that's because improper opinion. It's not just officer Sawyer. It's detective Matthews, those elicited by Jessica's own lawyer to officers gave improper opinion testimony here about their own credibility determinations as to as to Jessica's statements and that's the province of the jury. So if this court agrees as to those areas and argument three then that that alone requires a new trial. Thank you. Any further questions. I see none. Thank you gentlemen for your argument we'll take this matter under advisement.